10-0731-cr
USA v. Gansman

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2010

(Argued: February 16, 2011                    Decided: September 9, 2011)

Docket No. 10-0731-cr

UNITED STATES OF AMERICA,

*Appellee,*

v.

JAMES GANSMAN,

*Defendant-Appellant,*

DONNA MURDOCH,

*Defendant.*[*]

Before: CABRANES and CHIN, *Circuit Judges,* and KEENAN, *District Judge.*[**]

Appeal from a February 25, 2010 judgment of the United States District Court for the

Southern District of New York (Miriam Goldman Cedarbaum, *Judge*).  The principal question

presented is whether the District Court erred in declining to adopt an instruction proposed by

defendant setting forth a theory of the defense based in part on SEC Rule 10b5-2,  17 C.F.R.

§ 240.10b5-2.  We hold that Gansman was entitled to assert a theory of defense based in part on

---

[*] The Clerk of Court is directed to amend the official caption of this case to conform to the listing of the parties shown above.

[**]The Honorable John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation.

Rule 10b5-2, though we also hold that the slightly modified version of Gansman's proposed instruction given by the District Court was legally sufficient. Gansman's other challenges to his conviction are without merit.

Affirmed.

BARRY A. BOHRER, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, NY, *for defendant-appellant*.

VIRGINIA CHÁVEZ ROMANO, Assistant United States Attorney (Preet Bharara, United States Attorney, *on the brief*), Office of the United States Attorney for the Southern District of New York, New York, NY, *for appellee*.

JOSÉ A. CABRANES, *Circuit Judge*:

Defendant-appellant James Gansman ("defendant" or "Gansman") appeals from a February 25, 2010 judgment of the United States District Court for the Southern District of New York (Miriam Goldman Cedarbaum, *Judge*) convicting him of insider trading under the so-called "misappropriation theory." The Supreme Court has distinguished the misappropriation theory from the "classical" insider trading theory by explaining that "[i]n lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *United States v. O'Hagan*, 521 U.S. 642, 652 (1997).[1]

The principal question presented is whether the District Court erred in declining to adopt an instruction proposed by Gansman setting forth a theory of the defense based in part on SEC Rule 10b5-2, 17 C.F.R. § 240.10b5-2. Promulgated pursuant to § 10 of the Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78 et seq.) ("1934

---

[1] For additional explanation of the misappropriation theory, see Part A(i), *post*.

Act"),[2] Rule 10b5-2 provides a non-exclusive list of possible circumstances that give rise to a "duty of trust or confidence"—which in turn constitutes an element of the offense that must be proved by the government in a prosecution pursuant to the misappropriation theory of insider trading. The Rule provides, in relevant part:

> For purposes of this section, a "duty of trust or confidence" exists in the following circumstances, among others:
>
> (1) Whenever a person agrees to maintain information in confidence;
>
> (2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality; or
>
> (3) Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

---

[2] Section 10 of the 1934 Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange –
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §§ 78j(b) (emphasis supplied). The SEC has "the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976) (quotation marks omitted).

17 C.F.R. § 240.10b5-2 (emphasis supplied).[3]

Relying upon Rule 10b5-2, Gansman proposed the following jury instruction, in relevant part:

> In this case, Mr. Gansman contends that he did not provide Donna Murdoch with material nonpublic information with the understanding that Murdoch would use the information to purchase and sell securities. Any material non-public information that Murdoch may have received from Mr. Gansman was shared with her as part of a relationship of trust and confidence, in which they had a history and practice of sharing work and personal confidences such that Mr. Gansman reasonably expected that Murdoch would keep any confidences he shared with her confidential, and certainly expected that she would not use those confidences to buy or sell securities. Unbeknownst to Mr. Gansman, Murdoch used information he conveyed to her in confidence to trade securities for her benefit and the benefit of others . . . .

Joint App'x at 767 (emphasis supplied). We hold that Gansman was entitled to assert a defense theory that he did not have the requisite intent to commit securities fraud, and that in defining the nature of his relationship with Murdoch to the jury, he had the right to use language found in Rule 10b5-2.

Gansman raises a number of other challenges to his conviction, all of which are without merit.

---

[3] Rule 10b5-2, 17 C.F.R. § 240.10b5-2, should not be confused with Rule 10b-5, 17 C.F.R. § 2410.10b-5, which was also promulgated to implement § 10(b) of the 1934 Act and provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 2410.10b-5.

**BACKGROUND**

On February 25, 2010, after a trial by jury, Gansman was convicted of six counts of securities fraud, in violation of § 10(b) of the 1934 Act, 15 U.S.C. §§ 78j(b), 78ff, and its implementing regulations, SEC Rules 10b-5[4] and 10b5-2, 17 C.F.R. §§ 240.10b-5, 240.10b5-2.[5] He was prosecuted pursuant to a misappropriation theory of insider trading. *See* Part A, *post*; *see also United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (discussing the misappropriation theory). The evidence underlying the conviction, viewed "in the light most favorable to the prosecution," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), established the following facts.

Beginning in late 2005 and continuing through late 2007, Gansman participated in an insider trading scheme in which he repeatedly disclosed material non-public information to Donna Murdoch, a woman with whom he was having an affair. In his professional capacity as an attorney in the Transactional Advisory Services Department of Ernst & Young, LLP, Gansman obtained material non-public information about potential mergers and acquisitions. Gansman disclosed this information to Murdoch, in violation of his duty of confidentiality to Ernst & Young and its clients; Murdoch, in turn, traded on this information before the deals became public, profiting from the increase in stock price that occurred when the deals were later announced.[6] These basic facts are not disputed for purposes of this appeal. *See* Def.-Appellant's Br. at 3, 6-9.

---

[4] For the text of Rule 10b-5, *see* note 3, *ante.*

[5] Despite the seemingly "dubious validity of an open-ended delegation to an independent agency to go forth and create regulations criminalizing 'fraud,'" *see United States v. O'Hagan*, 521 U.S. 642, 691 (1997) (Thomas, J., concurring in part and dissenting in part), the Supreme Court has blessed this delegation of power, *see, e.g., O'Hagan*, 521 U.S. at 650-51 (majority op.). The Supreme Court has also held, however, that criminal liability under SEC regulations for insider trading may not extend beyond the conduct that Congress intended to encompass in § 10(b) of the 1934 Act. *Id.* at 651; *accord Hochfelder*, 425 U.S. at 214.

[6] Prior to Gansman's trial, Murdoch entered into a cooperation agreement with the government by which, *inter alia*, she agreed to cooperate as a witness against Gansman and pleaded guilty to fifteen counts of insider trading, one count of making false statements to federal officers, and one count of obstruction of justice. Gov't Br. at 8.

On February 8, 2010, the District Court sentenced Gansman principally to imprisonment of one year and one day on each count of securities fraud, to run concurrently. This appeal followed.

## A. Gansman's Defense Theory

### (i)

A person commits securities fraud for purposes of both civil and criminal enforcement actions under § 10(b) of the 1934 Act and Rule 10b-5 when he "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information."[7] *O'Hagan*, 521 U.S. at 652. Rule 10b5-2, in turn, lists a non-exclusive set of examples in which a "duty" arises for purposes of § 10(b) and Rule 10b-5. *See* 17 C.F.R. § 240.10b5-2 Preliminary Note; Insider Trading, U.S. Securities and Exchange Commission, http://www.sec.gov/answers/insider.htm ("[Rule10b5-2] provides that a person receiving confidential information under circumstances specified in the rule would owe a duty of trust or confidence and thus could be liable under the misappropriation theory.").

On appeal, Gansman contends that the District Court erred in declining to instruct the jury pursuant to a theory of the defense based in part on Rule 10b5-2. The proposed charge, set forth above, reflected a defense theory that Gansman lacked the requisite intent to commit securities fraud because he had shared material non-public information with Murdoch only "as part of a relationship of trust and confidence, in which they had a history and practice of sharing work and personal confidences." Joint App'x at 767. According to Gansman, he therefore "reasonably expected that

---

[7] The basic elements of proof for insider trading are the same for civil and criminal enforcement actions, but criminal enforcement differs principally with respect to the required intent and burden of proof. To impose criminal sanctions, the government must prove the offense beyond a reasonable doubt, including that the defendant's conduct was willful. 15 U.S.C. § 78ff(a); *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005). Civil liability, on the other hand, may attach if the government proves the offense by a preponderance of the evidence, including that the defendant's conduct was merely reckless, rather than willful. *S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998).

Murdoch would keep any confidences he shared with her confidential[ ] and . . . would not use those confidences to buy or sell securities."[8] *Id.*

The District Court declined to give Gansman's proposed instruction. Instead, it gave a slightly modified version of the charge, as follows:

> In this case, Gansman contends that he did not [provide Murdoch with insider information] with the understanding that she would use [it] to buy and sell securities. According to [Gansman], any material non[-]public information that Murdoch may have received from him was shared with her as part of a relationship in which they shared work and personal confidences.

Joint App'x at 1093-94.

To secure a reversal on a flawed jury charge, "a defendant must demonstrate both error and ensuing prejudice." *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009) (quotation marks omitted). No particular wording or phrasing is required for an instruction to be legally sufficient, so long as, "taken as a whole," the instruction correctly conveys the applicable law. *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (quotation marks omitted). At trial, the District Court gave an instruction that was substantially similar to the one Gansman requested and that clearly informed the jury of Gansman's theory that he lacked the requisite intent to commit the crime with which he was charged. Accordingly, in the circumstances presented here, we hold that the theory of the defense was adequately conveyed to the jury and defendant suffered no prejudice as a result of the District Court's instruction, even though the instruction did not use the exact words Gansman preferred.

Moreover, the government presented ample evidence that Gansman knew or had reason to know that Murdoch was trading on the information he gave her. The jury could have reasonably accepted this evidence. For example, the government presented evidence that:

---

[8] Although Gansman's requested charge did not explicitly reference Rule 10b5-2, Gansman's counsel stated that the charge was intended to mirror the language of the Rule. Joint App'x at 830-31.

- In late September 2006, following a profitable trade, Murdoch gave Gansman an Apple computer as a "thank you" present. Gansman said to her, "I don't even want to know how much you made with that trade."

- Gansman told Murdoch he kept expecting to see her name on an Ernst & Young list that Gansman "got whenever there was suspicious activity in a stock." The government proved that such a document existed; an Ernst & Young employee testified that the firm periodically circulated lists "with respect to trading on transactions where Ernst & Young has played a part in the transaction."

- After Gansman's last tip to Murdoch, relating to a 2007 corporate acquisition, Murdoch said she did not speak to Gansman immediately afterwards because she was "freaked . . . out" and she knew Gansman was "freaked out" as well. Murdoch had made approximately $138,000 on this deal, and, as she put it, "[i]t was a lot of money and it was very fast and it was too much. When Murdoch and Gansman finally spoke, they decided to put an end to their scheme: "No more. Can't do it . . . . I don't remember who said it first but it was sort of like blurted out of both of our mouths at the same time when it came out, no more, I agree we can't talk about this any more." According to Murdoch, Gansman said to her, "I love you but I don't want to go to jail. Sorry."

(ii)

The government further argues that the District Court would have *erred* if it had given the requested jury charge. We disagree.

In prosecuting a putative "tipper" under the misappropriation theory of insider trading, the government must prove as an element of the offense that the tipper conveyed material non-public information to his "tippee" with the understanding that it would be used for securities trading

8

purposes.  *See* 15 U.S.C. § 78ff(a); *see also* Indictment, *United States v. Gansman*, No. 08-cr-471, at 15

(S.D.N.Y. May 27, 2008) (charging Gansman with "disclosing . . . [i]nside [i]nformation . . . to

Murdoch, with the understanding that Murdoch would use [it] to purchase and sell securities, and

thereby generate illegal profits").  Pursuant to this misappropriation concept of insider trading

liability, the SEC has recognized a number of situations, set forth in Rule 10b5-2, in which a tippee,

but not the tipper, may be liable for insider trading on the theory that the tippee owed a duty of trust

or confidence to the tipper and the tipper conveyed confidential information without intending to

have it used for securities trading purposes.  *See, e.g.*, *United States v. Corbin*, 729 F. Supp. 2d 607

(S.D.N.Y. 2010); *see also S.E.C. v. Rocklage*, 470 F.3d 1 (1st Cir. 2006) (civil enforcement action in

which only the tippee was liable)*; S.E.C. v. Yun*, 327 F.3d 1263 (11th Cir. 2003) (same).

Here, it was perfectly appropriate for Gansman to seek to present to a jury a defense that his

relationship and interactions with Murdoch exemplified just such circumstances.  That is, Gansman

was entitled to support his general defense that he lacked the intent to commit securities fraud by

showing, in particular, that he shared "a history, pattern, [and] practice of sharing confidences" with

Murdoch sufficient to create a duty of trust running to Gansman, *see* SEC Rule 10b5-2, and that

Gansman had confided in Murdoch with the understanding that his communications would not be

used for securities trading purposes.[9]  By presenting the defense theory in this way, Gansman

presumably wished to show that his relationship with Murdoch was factually similar to cases in which

a tipper (like Gansman) was <u>not</u> liable for insider trading despite the presence of a tippee (like

Murdoch) who <u>was</u> liable for insider trading.  *See Corbin*, 729 F. Supp. 2d 607; *Rocklage*, 470 F.3d 1;

---

[9] Of course, evidence of a past relationship of confidentiality between two people does not <u>necessarily</u> mean that a duty of confidentiality exists with respect to a particular communication of material non-public information, and a district court would err in so instructing a jury.  Evidence of a history of confidentiality between parties can be outweighed by other evidence that a tipper understood the specific information in question would be used by the tippee for securities trading purposes.  Accordingly, evidence reflecting a relationship of trust may be *relevant* to the question of whether a tipper had the requisite intent to commit securities fraud, but it is not necessarily dispositive of the question, which will depend upon the particular circumstances revealed by all of the evidence.

*Yun*, 327 F.3d 1263.  Gansman could have been properly acquitted of the crime with which he was charged if the trier of fact had agreed with his theory.[10]

In arguing that Gansman was not entitled to assert this defense, the government incorrectly frames the issue as a question of whether a duty of trust or confidence under Rule 10b5-2 can be owed to an individual who transmits material non-public information <u>with the knowledge and intent that it will be used for securities trading purposes</u>.  *See, e.g.*, Gov't's Br. at 24 (arguing that the Rule cannot apply to Gansman insofar as he was a "tipper"); Gov't's Supp. Br. at 1 n.1 (stating that the government "uses the term 'tipper' to refer to a party who misappropriates inside information . . . with the knowledge or intent that the recipient will trade on it").  In our view, the government's logic is neither useful nor instructive with respect to the propriety of Gansman's requested jury charge, for the simple reason that Gansman was entitled to put on a defense that did not rest on the premise that he intended to commit securities fraud.  Indeed, Gansman concedes that a person with the intent to commit securities fraud would not be owed a duty of trust pursuant to Rule 10b5-2, *see* Def.-Appellant's Supp. Br. at 2 n.1.  His claim, of course, is that he was <u>not</u> such a person—a claim that, alas, the jury found unpersuasive.

---

[10] Under Rule 10b5-2, a duty of trust or confidence can be owed to someone in Gansman's position—that is, to a person <u>who was authorized to have</u> the material non-public information in question and therefore who qualifies as a "source of information" under *O'Hagan, see* 521 U.S. 642.  However, we question whether that duty of trust or confidence can ever be relevant (or owed) to a person <u>who was never authorized in the first place</u> to have such information.  *O'Hagan* explained that the misappropriation theory proceeds from the principle that a "fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information [and therefore violates § 10(b)]."  521 U.S. at 652.  A person who was without authority to have the confidential information in question (*e.g.*, a person one or more steps down the tipping "chain") can hardly be considered a "principal" whose rights to the "exclusive use of th[e] information" were violated by his tippee.  *See also id.* ("In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.").

In sum, we hold that the District Court would not have erred if it had given Gansman's requested jury charge,[11] but also that the slightly modified charge it did give was legally sufficient.

### B. Conscious Avoidance

Gansman argues that the District Court's charge on conscious avoidance "misstated the law . . . [a]nd confused the jury." The principal conscious avoidance charge given by the District Court provided, in relevant part:

> [I]n determining whether Gansman acted knowingly, you may consider whether he deliberately closed his eyes to what would otherwise have been obvious to him . . . . If you find that Gansman was aware of a <u>high probability</u> that Murdoch would use the inside information he disclosed to her to purchase or sell securities and that Gansman acted with deliberate disregard of that fact you may find that he acted knowingly. However, if you find that Gansman <u>actually believed</u> that Murdoch would not purchase or sell securities using that inside information[,] he may not be convicted.

Joint App'x at 1086 (emphasis supplied). While Gansman concedes that this instruction regarding "high probability" and "actual[] belie[f]" was unobjectionable, *see* Def.-Appellant's Br. at 30, he argues that the Court subsequently erred by failing to reiterate the "actual[] belie[f]" language in a later instruction, which charged:

> [Y]ou will determine whether the government has proved beyond a reasonable doubt that the defendant understood that Murdoch was very likely to use information he disclosed to her to buy or sell securities.

Gansman's claim is without merit because it is based on a reading of the second instruction in isolation. In the circumstances presented here, there can be no doubt that the instructions as a whole "adequately communicated the essential ideas to the jury." *United States v. Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010) (quotation marks omitted).

---

[11] We note that although Gansman's proposed instruction did not repeat the phrase "Mr. Gansman contends . . ." prior to each statement within the instruction, the use of that phrase at the beginning of the instruction and the context and structure of the remaining statements reflected that each statement was merely the defendant's contention, and not an established fact that the jury was required to accept.

**C. Polygraph Evidence**

Gansman also challenges the District Court's exclusion of testimony that "Murdoch obstructed justice by engaging in studied efforts to 'beat' two polygraph examinations." Specifically, at trial, the District Court held that the defense could cross-examine Murdoch regarding her multiple polygraph examinations, her efforts to "beat" the tests, and her numerous lies during those tests; however, the District Court prohibited the defense from eliciting the actual results of the tests, explaining:

> [B]ecause I do not think that it is sufficiently relevant that she was able to deceive a lie detector expert, because of the unreliability generally of lie detectors . . . and in order not to have the jury speculating about the reliability of lie detectors, I do not think it is admissible, and I preclude it under [Federal Rule of Evidence] 403 because I think it leads to confusion and distraction, and I do not think that it adds very much relevance.

Joint App'x at 121-22.[12]

We review the District Court's ruling for abuse of discretion. *See United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011); *see also Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (explaining "abuse of discretion"). Here, the restriction imposed by the Court was much narrower than Gansman acknowledges, and despite this restriction, Gansman succeeded in cross-examining Murdoch at length about the polygraph examinations. Accordingly, we hold that the District Court's ruling was a reasonable exercise of its discretion to delimit cross-examination under Rule 403.

---

[12] Federal Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

## D. Impeachment by Third-Party Conviction

Gansman asserts that the District Court improperly prohibited him from cross-examining Murdoch about her father's previous securities fraud convictions. According to Gansman, introducing the conviction was necessary to elicit that Murdoch had "visited her father in jail and it was painful and awful and [going to jail is] something she's willing to avoid at all costs."

Gansman's claims are without merit. Rule 609 of the Federal Rules of Evidence provides that "evidence that <u>a witness</u> . . . has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year," and "evidence that <u>any witness</u> has been convicted of a crime shall be admitted regardless of punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by a witness." (emphases supplied). This Rule does not provide for the introduction of <u>a third party's</u> prior conviction as a proper subject of cross-examination, especially when that conviction creates a prejudicial inference that the witness is disposed to act in a certain way or is otherwise closely associated with criminality. Perhaps not surprisingly, when the District Court invited Gansman's able counsel to provide it with case law in support of the idea that a witness may be impeached with the prior conviction of another, he was unable to do so.[13]

Finally, as the District Court noted at trial, evidence about the convictions of Murdoch's father was not necessary for Gansman to argue that Murdoch had an incentive to lie in order to stay out of jail. Accordingly, we hold that the District Court did not abuse its discretion in determining that the relevance of Murdoch's father's past was outweighed by the potentially prejudicial effect on the jury. *Curley*, 639 F.3d at 56.

---

[13] We remain unaware of any published cases—in our Circuit or in any other—providing that a third party's prior conviction may be used to impeach a witness on cross-examination.

**E. Alleged Prosecutorial Misconduct**

Gansman also argues that the government engaged in misconduct during its initial closing argument because it (1) mistakenly claimed that Murdoch described herself as a "trading junkie" on a website viewed by Gansman, and (2) described her as a "trading junkie" in both its main summation and rebuttal and argued that Gansman knew she was a "trading junkie."

In its main summation, the government indeed stated, incorrectly, that "[t]he first thing James Gansman learned about Donna Murdoch <u>on the internet</u> before he ever laid eyes on her was that she was a trading junkie." Joint App'x at 964 (emphasis supplied). After Gansman's counsel objected, the government acknowledged it had misunderstood the nature of the testimony upon which the comment was based. Accordingly, the District Court instructed the jury that the government's statement about the website was to be stricken from the record "and not considered . . . in any respect in the course of your deliberations [because] . . . there is no such evidence in the record." Joint App'x at 987.

The defense then gave its closing argument, during which Gansman's own counsel pressed the notion—as he had done during Murdoch's cross-examination earlier in the trial—that she was indeed a "trading junkie" (though she had never listed herself as such on a website) and that she had kept this secret from Gansman. Joint App'x at 530-31, 1009. In rebuttal, the government agreed that Murdoch was a "trading junkie" but challenged the proposition that Gansman was unaware of this fact. In these circumstances, we are not persuaded that the government acted improperly, much less engaged in prosecutorial misconduct.

"Flaws in the government's summation will require a new trial only in the rare case in which improper statements—viewed against the entire argument to the jury—can be said to have deprived the defendant of a fair trial." *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010). In considering whether inappropriate remarks rise to the level of prejudicial error, we examine "the severity of the

misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *Id.* at 41 (quotation marks omitted).

Here, the single mistaken comment of the prosecutor in his initial closing argument—that Murdoch had described herself as a "trading junkie" on a website—was promptly corrected by the District Court. There can be no serious argument that this remark, based on the government's acknowledged misunderstanding of earlier testimony and followed by the Court's curative instruction, deprived Gansman of a fair trial.

Nor was it error for the government in its rebuttal to state generally that Murdoch was a "trading junkie" and that Gansman was aware of that fact. This description of Murdoch was originally introduced at trial by the defense, *see* Joint App'x at 530-31; furthermore, the government firmly grounded this characterization in the evidence presented by the defendant as well as by the government.

In sum, notwithstanding the government's initial mistake in its main summation, its later references to Murdoch as a "trading junkie" constituted fair argument and properly responded to inferences raised by the defense.

## CONCLUSION

To summarize:

(1) Gansman was entitled to assert a theory of defense based in part on Rule 10b5-2.

(2) Nevertheless, Gansman is not entitled to a new trial in the circumstances presented here because the slightly modified instruction given by the District Court was legally sufficient.

(3) The District Court did not err in charging the jury on conscious avoidance.

(4) The District Court did not err in delimiting Gansman's cross-examination of Murdoch regarding her polygraph examinations.

(5) The District Court did not err in prohibiting Gansman from impeaching Murdoch with

15

evidence about her father's convictions.

(6) The government's error in its initial closing argument was properly cured, and its later references to Murdoch as a "trading junkie" constituted fair argument.

We have considered each of Gansman's arguments on appeal and find them to be without merit.  For the reasons stated above, we **AFFIRM** the judgment of the District Court.